2002 WY 92

**Shawn LEWIS, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 00–238.

Supreme Court of Wyoming.

June 20, 2002.

Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Appellate Counsel; Tina Kerin, Assistant Appellate Counsel; Diane Courselle, Director, Stephanie Fabian, Student Intern, Prisca Clark, Student Intern, and Paul R. Flick, Student Intern, of the Wyoming Defender Aid Program, Representing Appellant. Argument by Mr. Flick.

Gay Woodhouse, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General, Representing Appellee. Argument by Mr. Pauling.

Before LEHMAN, C.J., and GOLDEN, HILL, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] Following an aggravated assault and battery, police determined that Appellant Shawn J. Lewis had lied to them about the identity of the assailant. Lewis was arrested for accessory after the fact and interrogated several times while in custody without the advisement of rights mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). During interrogation, Lewis invented a fictitious name for the assailant and concocted a story for police who began investigating to try to locate a nonexistent suspect. The police's independent investigation soon indicated that Lewis had lied, and police secured a search warrant for his home that revealed independent evidence that Lewis had lied to them about the assailant's identity. Lewis voluntarily returned to speak with investigating police officers in the presence of his mother and minister. After receiving a *Miranda* advisement, Lewis waived his rights and confessed to lying in order to protect his uncle whom he had seen commit the aggravated assault and battery and who was staying in Lewis' home. The trial court determined that this last statement was voluntary and denied Lewis' motion to suppress his statements. All of Lewis' statements were admitted against him at trial, and he was convicted.

[¶ 2] We hold that the failure to advise of *Miranda* required suppression of Lewis' statements made while in police custody. Those statements that followed his voluntary

return and waiver of *Miranda* rights were properly admitted at trial. Because all of Lewis' statements were admitted at trial, we examine, as we must, whether the constitutional error was harmless beyond a reasonable doubt. We conclude that it was and affirm Lewis' conviction.

### ISSUES

[¶ 3] Lewis presents this issue for our review:

Did the trial court commit error by failing to suppress evidence obtained by police in violation of Shawn Lewis's Miranda rights?

The State rephrases the issue:

Whether the trial court committed reversible error in denying Appellant's motion to suppress evidence?

### FACTS

[¶ 4] On August 22, 1999, a warrant issued for Lewis' arrest stating that he

did render assistant [sic] to an unknown suspect, with intent to hinder, delay or prevent the discovery, detection, apprehension, prosecution, detention, conviction or punishment of another for the commission of a crime, in violation of Wyoming Statute § 6–5–202(a)(b)(i). . . .

[¶ 5] The affidavit of probable cause supporting this warrant and felony information stated that while investigating an aggravated assault committed upon Jordan Foster at 12:30 a.m. on August 22, 1999, police officer Deaton learned from Chris Weber that the assailant had arrived at and left the crime scene as a passenger in the back seat of an old maroon Ford Probe. Weber provided a physical description of the suspect. This vehicle was located by the police minutes later, and the officer took Weber to that location. Weber identified the two occupants as Shawn Lewis and Lewis' girlfriend, Shelly Lane, and stated that both had occupied the Probe at the time Foster was assaulted. The third person, the assailant, was not present. Another witness, Amanda Jameson, confirmed that Lane had been in the Probe at the time of the assault. Lane was questioned and denied knowing anything about the assault, denied being present during the assault, and

stated that she had been with her boyfriend, Lewis, at his residence watching movies. Lewis was interviewed by Sergeant Seeman and also denied being present during an assault, denied knowing about the assault or the identity of the assailant, and stated no third person had been in his car during the evening. Later, Officer Deaton and Detective Steve Rozier went to Lewis' residence and questioned Lewis again, and he again denied being present at the crime scene or knowing the identity of the suspect. The officers then interviewed Jameson again, and she identified Lane as an occupant and provided a physical description of the Probe's driver that matched Lewis' physical characteristics.

[¶ 6] The officer's affidavit stated that, from this investigation, he had determined that Lewis was driving the Probe when it arrived at the crime scene, that Lewis drove the suspect away after the assault, and that Lewis refused to provide the identity or whereabouts of the suspect in the aggravated assault and further denied being present during the assault on Foster all in violation of statute.

[¶ 7] Wyo. Stat. Ann. § 6–5–202 (LexisNexis 2001), accessory after the fact, provides in pertinent part:

(a) A person is an accessory after the fact if, with intent to hinder, delay or prevent the discovery, detection, apprehension, prosecution, detention, conviction or punishment of another for the commission of a crime, he renders assistance to the person.

(b) An accessory after the fact commits:

(i) A felony punishable by imprisonment for not more than three (3) years, a fine of not more than three thousand dollars ($3,000.00), or both, if the crime is a felony and the person acting as an accessory is not a relative of the person committing the crime[.]

[¶ 8] Wyo. Stat. Ann. § 6–5–201 (LexisNexis 2001) provides these relevant definitions:

(iii) "Relative" means a grandparent, grandchild, mother, father, husband, wife, sister, brother or child; and

(iv) "Render assistance" means to:

(A) Harbor or conceal the person;

(B) Warn the person of impending discovery or apprehension, excluding an official warning given in an effort to bring the person into compliance with the law;

(C) Provide the person with money, transportation, weapon, disguise or other thing to be used in avoiding discovery or apprehension;

(D) By force, intimidation or deception, obstruct anyone in the performance of any act which might aid in the discovery, detection, apprehension, prosecution, conviction or punishment of the person; or

(E) Conceal, destroy or alter any physical evidence that might aid in the discovery, detection, apprehension, prosecution, conviction or punishment of the person.

[¶ 9] The probable cause affidavit does not seem to support finding that Lewis "rendered assistance" as defined by the statute; nevertheless, Lewis was taken into custody.[1] Detective Rozier testified that Lewis was not advised of his *Miranda* rights at that time although Lewis was questioned several times that night. Rozier claimed that the *Miranda* advisement was unnecessary because he was engaging in plea negotiations with Lewis.[2] During this custodial interrogation, Lewis told Rozier that the identity of the assailant was Terry Perry. Rozier began searching for Perry and, by the next day, began to suspect that Lewis had lied about the identity of the person who had assaulted Foster. Lewis had indicated that Perry had left a bloody shirt in the car after the assault, and that he could provide Perry's phone number and his photograph after he returned home. Rozier arrived at Lewis' house to retrieve the bloody shirt, Perry's phone number, and Perry's photograph. Lewis refused to allow Rozier to enter the residence, the bloody shirt was not in the car, Lewis was unable to provide Rozier with the phone number, and Lewis produced the top portion of a photograph stating that it was part of a collage. Based on these events, Rozier sought a search warrant and stated in his affidavit that he believed that information existed at Lewis' residence that identified the suspect and his whereabouts, residence, or place of employment and telephone number.

[¶ 10] The search warrant issued, and Rozier conducted his search while Lewis was present. Rozier discovered the rest of the photograph that showed it was not part of a collage, but a photograph that included children, one of whom was Lewis at a much younger age. A man named David Wayne O'Brien, Lewis' uncle, was present at the house, and Rozier quickly determined that O'Brien was the suspected perpetrator of the assault upon Foster. Marijuana was also in plain view, and, after O'Brien claimed it, Rozier arrested him.

[¶ 11] The next day, August 24, Lewis arrived at police headquarters with his mother and their minister. Rozier advised him of his *Miranda* rights and told him that he faced felony charges. Lewis then confessed to lying about O'Brien's identity and to supplying Rozier with a false name and photograph to lead police away from O'Brien. On October 15, 1999, an amended felony information was filed charging that Lewis' conduct between the dates of August 22 and 24 violated Wyo. Stat. Ann. § 6–5–202, accessory after the fact, and the accompanying affidavit included all of the events just discussed.

[¶ 12] On December 10, 1999, Lewis filed a motion to suppress all statements made or given by him, and searches made from and after he was arrested on August 22, 1999. Lewis claimed that he had requested an attorney and was told that he could not speak to an appointed attorney and did not have

---

1. Refusal to speak to police is not a crime. In *Stephens v. State*, 734 P.2d 555, 557 (Wyo.1987), this Court reversed an accessory after the fact conviction to burglary upon similar facts.

2. Because Rozier testified that he had the district attorney's permission to negotiate a plea bargain, had the trial court determined plea negotiations were properly occurring, then the statements would have been inadmissible because the "accused's statement relating to the failed plea is inadmissible on the crucial issue of guilt or innocence." *Harvey v. State*, 835 P.2d 1074, 1135 (Wyo.1992) (Golden, J., dissenting). Because the trial court made no such finding, we confine our discussion to *Miranda* analysis.

any rights for the investigation into the identity of Foster's attacker.[3]

[¶ 13]   The trial court held a hearing, at which Rozier testified that Lewis had not been advised of his *Miranda* rights. Rozier stated that he offered Lewis a plea agreement whereby Lewis would be charged with a misdemeanor if he identified the assailant and that Lewis had then told him of Terry Perry. Lewis testified that Rozier did not discuss a plea agreement with him, but instead told him that he had no constitutional right to an attorney when he was being interrogated about a crime committed by someone else.

[¶ 14]   The trial court denied the motion to suppress, stating the following:

1.   Defendant's statements to Sgt. Detective Rozier on August 24, 1999, after the Defendant appeared at the Gillette Police Department with his mother and Pastor Gordon Harper and initiated contact with Sgt. Detective Rozier, were clearly voluntary.

2.   Defendant's statements made to Sgt. Detective Rozier on August 23, 1999, were made during contact with the Defendant when Detective Rozier's investigation was focusing upon the criminal activity of a person other than the Defendant, and at that time, the Defendant misled the Detective as to the circumstances involving the crime committed by this other person, and as such, the Defendant engaged in a continuing course of conduct that was criminal. Upon review of all of the evidence presented, advisement of constitutional rights was not necessary,[4] and further, Defendant's statements were voluntarily made.

The Court does not entirely endorse all of Sgt. Detective Rozier's testimony but the Defendant's testimony, if not contrived, was conspicuously convenient and the Court finds Sgt. Detective Rozier's rendi-

tion of the facts to be most compelling and credible.

[¶ 15]   Lewis was tried on one count of accessory after the fact. In its opening statement, the prosecution stated that, during their first contact, Rozier had told Lewis that Lewis had been identified as the driver of the vehicle which drove away the assailant after the assault and that failure to identify the assailant would cause his arrest for accessory after the fact. The prosecutor's opening statement clarified that the State considered all of Lewis' conduct between August 22 and August 24 as providing proof that Lewis had violated the accessory after the fact statute.

[¶ 16]   Lewis was convicted and sentenced to sixteen to thirty-six months, and this appeal of the denial of the motion to suppress followed.

## DISCUSSION

[¶ 17]   Before a suspect's statements given during custodial interrogation are admissible in evidence, certain advisements must be made. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The United States Supreme Court recently held that the advisements required by *Miranda* are not just prophylactic but arise out of the Constitution, and that a defendant's custodial interrogation statements must therefore be excluded unless the defendant was first notified of his *Miranda* rights. *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). *Dickerson* stated:

Accordingly, we laid down "concrete constitutional guidelines for law enforcement agencies and courts to follow." Those guidelines established that the admissibility in evidence of **any statement** given during custodial interrogation of a suspect would depend on whether the police pro-

---

3.   Lewis' motion to suppress raised only the *Miranda* violation and did not raise voluntariness or illegal arrest issues, and these are not addressed on appeal.

4.   The State does not contend in this appeal that this ground supports the trial court's decision. We are unaware of any law that *Miranda* is

unnecessary for custodial interrogation because police are investigating another crime; however, that reasoning does not apply to Fifth Amendment *Miranda* warning violations, but does apply to Sixth Amendment rights to counsel. *See Texas v. Cobb,* 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001).

vided the suspect with four warnings. These warnings (which have come to be known colloquially as *"Miranda* rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

*Id.* at 435, 120 S.Ct. at 2331 (citations omitted and emphasis added). Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made. Thus, the "fruit of the poisonous tree" doctrine does not apply to confessions obtained after an initial confession that was voluntary but not preceded by *Miranda* warnings. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Roderick v. State,* 858 P.2d 538, 545–47 (Wyo.1993). In *Elstad,* the Court held that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 313, 105 S.Ct. 1285.

■ [¶ 18] Although statements must be suppressed upon a showing of a *Miranda* violation, even when *Miranda* has been complied with, the Fifth and Fourteenth Amendments to the United States Constitution, as well as Wyo. Const. art. 1, §§ 6 and 11, require admissions and statements to be voluntary. *Mitchell v. State,* 982 P.2d 717, 721 (Wyo.1999); *Doyle v. State,* 954 P.2d 969, 971–72 (Wyo.1998); *State v. Evans,* 944 P.2d 1120, 1124 (Wyo.1997). *Mitchell* summarized the law:

> To be voluntary, the defendant's statements must result from "free and deliberate choice rather than intimidation, coercion, or deception." *Madrid v. State,* 910 P.2d 1340, 1344 (Wyo.1996). Because we presume a defendant's statements to be involuntary, the burden rests on the State to show, by a preponderance of the evidence, that the defendant's statements were voluntary. *Evans,* 944 P.2d at 1126–

27. Once the State has met its burden and rebutted the presumption of involuntariness, the defendant may be required to present evidence demonstrating the involuntariness of his statements. *Id.* at 1126. If such statements resulted from coercion, then the statements are inadmissible at trial for any purpose because their validity is suspect. *Id.* at 1125.

> Voluntariness is a legal question; thus, we review the ultimate issue, whether a defendant's statements were voluntary, de novo. *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449–50, 88 L.Ed.2d 405 (1985); *Doyle,* 954 P.2d at 972; *Simmers v. State,* 943 P.2d 1189, 1194 (Wyo.1997); *Evans,* 944 P.2d at 1124. On review, however, we will not disturb the trial court's findings of fact unless clearly erroneous. *Id.* We look to the totality of the circumstances to determine if the defendant's statements were voluntary. *Vigil v. State,* 859 P.2d 659, 664 (Wyo.1993).

982 P.2d at 721.

[¶ 19] Lewis contends that the "plea negotiations" were custodial interrogations conducted in violation of *Miranda;* but also argues that if this Court finds that they were plea negotiations, the statements remain inadmissible under W.R.Cr.P. 11(e)(6). The trial court did not find that the statements were admissible because they were plea negotiations, the State does not contend that W.R.Cr.P. 11(e)(6) would not apply, we have previously acknowledged its applicability, and we see no need to address the matter. Lewis addresses neither the voluntariness of his first statement nor the admissibility of the statement made to police in the presence of his mother and minister after receiving *Miranda* warnings. Lewis, instead, contends that, if his statement is suppressed in accordance with *Miranda,* then no crime was committed and his conviction must be reversed without remand for trial.

[¶ 20] In its brief, the State does refer us to the holdings of *Elstad* and *Roderick,* but claims that the trial court could not suppress statements taken in violation of *Miranda* because those statements constituted the crime for which he is being prosecuted. The State tells us that the Fifth Amendment does

not protect Lewis because he provided false information when he voluntarily spoke:

[Although] his initial statements to Rozier might be subject to suppression, to the extent they would be offered to prove criminal acts completed prior to his making the statements, but that they were not subject to suppression in a prosecution relating to the falsity of those statements.

[¶ 21] The State concedes that its argument is unsupported by authority because of the peculiar facts of this case, but claims that federal decisions have permitted admission of statements made without advisement of *Miranda* in prosecutions for perjury. The State refers us to a series of United States Supreme Court decisions discussing the applicability of the Fifth Amendment privilege to false tax return statements and witness testimony before a grand jury. *United States v. Knox*, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977); *United States v. Apfelbaum*, 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980). In all cases, the witness had committed perjury in violation of federal statute. Although the Court has not decided whether the failure to give *Miranda* warnings to a grand jury witness is a defense to a perjury charge based on the witness' false grand jury testimony, the Court itself noted that *Miranda* applied to "custodial interrogations," which "did not include questioning before the grand jury." 3 Wayne R. LaFave et al., *Criminal Procedure* § 8.10(d), at 201–02 (2nd ed.1999). LaFave reports that the Court's general view is that:

The position of the subpoenaed witness could hardly be compared to that of the arrestee subjected to interrogation in the "hostile" and "isolated" setting of the police station. The appropriate analogy was to the questioning of a witness in an administrative or judicial hearing. As noted by Justice Frankfurter in *United States v. Monia*, [317 U.S. 424 (1943), 63 S.Ct. 409] a witness in that setting "if . . . he desires the protection of the privilege, . . . must claim it or he will not be considered to

have been 'compelled' within the meaning of the Amendment."

*Id.* at 202.

[¶ 22] Regarding the tax form disclosure cases, the Court has stated:

Garner relies first on cases dealing with coerced confessions, *e.g., Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where the Court has required the exclusion of incriminating statements unless there has been a knowing and intelligent waiver of the privilege regardless of whether the privilege has been claimed. *Id.*, at 467–469, 475–477, 86 S.Ct. at 1624–1625, 1628–1629, 16 L.Ed.2d at 719–721, 724–725. Garner notes that it has not been shown that his failure to claim the privilege was such a waiver.

It is evident that these cases have little to do with disclosures on a tax return. The coerced-confession cases present the entirely different situation of custodial interrogation. See *id.*, at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719. It is presumed that without proper safeguards the circumstances of custodial interrogation deny an individual the ability freely to choose to remain silent. See *ibid.* At the same time, the inquiring government is acutely aware of the potentially incriminatory nature of the disclosures sought. Thus, any pressures inherent in custodial interrogation are compulsions to incriminate, not merely compulsions to make unprivileged disclosures. Because of the danger that custodial interrogation posed to the adversary system favored by the privilege, the Court in *Miranda* was impelled to adopt the extraordinary safeguard of excluding statements made without a knowing and intelligent waiver of the privilege. *Id.*, at 467, 475–476, 86 S.Ct. at 1624, 1628–1629, 16 L.Ed.2d at 719, 724–725; see *Michigan v. Mosley*, 423 U.S. 96, 97, 96 S.Ct. 321, 324, 46 L.Ed.2d 313, 319 (1975); *Schneckloth v. Bustamonte*, 412 U.S. 218, 246–247, 93 S.Ct. 2041, 2057–2058, 36 L.Ed.2d 854, 873–874 (1973). Nothing in this case suggests the need for a similar presumption that a taxpayer makes disclosures on his return rather than claims the privilege because his will is overborne. In fact, a

taxpayer, who can complete his return at leisure and with legal assistance, is even less subject to the psychological pressures at issue in *Miranda* than a witness who has been called to testify in judicial proceedings. Cf. *United States v. Kordel,* 397 U.S., at 9–10, 90 S.Ct. at 768–769, 25 L.Ed.2d at 8–10; *Miranda, supra,* 384 U.S., at 461, 86 S.Ct. at 1620, 16 L.Ed.2d at 716.

*Garner v. United States,* 424 U.S. 648, 657–58, 96 S.Ct. 1178, 1183–84, 47 L.Ed.2d 370 (1976).

[¶ 23] We find, therefore, that the State's analogy is inapposite, and we do not believe that this case falls in with those cases examining crime-by-words as an exception to a *Miranda* violation. 3 LaFave, *supra,* § 9.5(e), at 394. Courts have recognized that, for policy reasons, *Miranda's* scope of exclusion does not reach so far that it would prohibit admission of statements that constitute a new, separate and distinct crime from that for which the defendant was in custody when the *Miranda* violation occurred. *Id.* Generally, however, the courts applying this exception have limited it to spontaneous, voluntary statements that constitute statutory violations prohibiting bribery or threats against the life of the president. *Id.; United States v. Paskett,* 950 F.2d 705, 707 (11th Cir.1992); *United States v. Gordon,* 974 F.2d 1110, 1115 (9th Cir.1992). Here, Lewis was arrested for lying about the assailant's identity. He was not read his constitutional rights as mandated by *Miranda,* and in the course of custodial interrogation, promises were made to him and he again lied about the assailant's identity. He was tried for one count of accessory after the fact for a "continuing course of criminal conduct" between August 22 and 24. The State does not advance any argument or provide authority that this exception's policy reasons would apply to Lewis' statements sufficiently for this Court to recognize it as spontaneous and voluntary.

[¶ 24] Further, LaFave's explanation that the "deterrent objective of the *Miranda* doctrine need not be extended so far as to thwart the punishment of such crimes, which are sufficiently infrequent and unpredictable as to be unlikely objectives of a police deviation from *Miranda,*" does not apply to Lewis' situation. 3 LaFave, *supra,* at 394. The following explains our view:

It is clear that the exclusionary rule in fifth amendment cases deters police misconduct, as it does in fourth amendment cases, and ensures the trustworthiness of evidence. *See Michigan v. Tucker,* 417 U.S. 433, 446–50, 94 S.Ct. 2357, 2364–67, 41 L.Ed.2d 182 (1974). However, application of the rule for fifth amendment violations has only an incidental effect on deterrence because that rationale is not the primary purpose for the rule in situations in which the fifth amendment is implicated. Thus, in many contexts, exclusion of evidence collected in violation of a defendant's fifth amendment rights is required to implement those rights. It has been noted that, while one principal purpose of the judicially created fourth amendment exclusionary rule is to deter official misconduct, "[t]he Fifth Amendment, in contrast, is by its terms an exclusionary rule...." *United States v. Kurzer,* 534 F.2d 511, 516 (2d Cir.1976). *Accord United States v. Tantalo,* 680 F.2d 903, 908 (2d Cir.1982); *United States v. Cella,* 568 F.2d 1266, 1285 (9th Cir.1977); *In re Grand Jury Proceedings,* 497 F.Supp. 979, 983 (E.D.Pa.1980). *See also United States v. Henderson,* 406 F.Supp. 417, 421 n. 4 (D.Del.1975) (the judicially created fourth amendment exclusionary rule and the constitutionally mandated exclusion of evidence obtained in violation of fifth amendment rights rest upon different grounds, and are not subject to the same analysis).

Legal commentators have recognized this distinction between the fourth and fifth amendment exclusionary rules. One author has observed that, because "the primary purpose of the Fifth Amendment privilege is to avoid forcing an individual to contribute to the imposition of criminal penalties upon himself, not to protect his privacy," Comment, *Standards for Exclusion in Immunity Cases after Kastigar and Zicarelli,* 82 Yale L.J. 171, 177 (1972), it is inadequate merely to apply the deterrence rationale of the fourth amendment exclusionary cases to the fifth amendment:

Thus, unlike the Fourth Amendment, the Fifth Amendment is directly concerned with the introduction of tainted evidence at trial; it is in fact the introduction of such evidence that constitutes the primary violation of the Amendment. Even if the exclusion of evidence derived from a coerced confession is unlikely to have a deterrent effect on the police, its introduction will still represent an infringement on the individual's privilege against self-incrimination.

*Id.* at 178 (footnote omitted). Another writer states that "[t]he privilege against self-incrimination thus simply is the exclusion of such evidence: without this exclusion there is no privilege." Zupancic, *The Privilege Against Self–Incrimination,* 1981 Ariz. St. L.J. 1, 19. "This point cannot be over-emphasized. The substantive sanctions against the police who violate the privilege ... simply are not adequate. This is not a question of deterring police from future misconduct." *Id.* at 19 n. 5.

*People v. Briggs,* 709 P.2d 911, 919 (Colo. 1985).

[¶ 25] Under these facts, the *Miranda* violation requires suppression of all of Lewis' statements that constituted the crime. However, Lewis returned to police and, in front of his mother and minister, received a *Miranda* warning, waived those rights and then fully confessed that, while in police custody, he lied to police by identifying the fictional "Terry Perry" as the assailant. According to *Elstad,* this confession is admissible in evidence despite the *Miranda* violation if voluntary and Lewis does not contend that it was not voluntary.

[¶ 26] Thus, the remaining question is whether the admission at trial of those statements that should have been suppressed was harmless error. The admission of testimony in violation of *Miranda* constitutes a violation of Lewis' due process rights. *See Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612; *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *see also Dickerson,* 530 U.S. at 443–44, 120 S.Ct. at 2336. However, the finding of constitutional error does not automatically necessitate reversal. The erroneous admis-

sion of statements taken in violation of a defendant's Fifth Amendment rights is subject to harmless error analysis. *Neder v. United States,* 527 U.S. 1, 18, 119 S.Ct. 1827, 1838, 144 L.Ed.2d 35 (1999). Whether a constitutional error was harmless is reviewed de novo. In undertaking our de novo review of the prejudicial effect of the erroneous admission of testimony, the question is whether the erroneously admitted evidence had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722–23, 123 L.Ed.2d 353 (1993) (quoting and adopting standard in *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). A reviewing court does not examine whether there was sufficient evidence to support the conviction in the absence of the constitutional error. Rather, ordinarily, we must ask whether the verdict was surely unattributable to the error. *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) ("The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."); *Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1248. If, after conducting such an inquiry, we conclude that the error had a "substantial and injurious effect or influence," we must set aside the jury's findings. The State bears the burden that an error is harmless under this standard. *Seeley v. State,* 959 P.2d 170, 178 (Wyo.1998) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)).

[¶ 27] Without Lewis' statements that should have been suppressed, the police had the evidence obtained from their independent investigation and from the search of Lewis' home, including the actual assailant, as evidence that Lewis had "rendered assistance" in violation of the statute. Lewis' post-*Miranda,* voluntary statement confirmed that the evidence showed that he had provided false statements to the police with the intent to hinder, delay, or obstruct their investigation and render assistance to O'Brien. The improper admission of Lewis' unwarned

statements did not have a substantial and injurious effect or influence on the jury, and we find the error to have been harmless.

[¶ 28]   The conviction is affirmed.